UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LESTER L. HUMMER,

      *Plaintiff*,

v.

UNITED STATES OF AMERICA,

      *Defendant*.

Civil Action No. 18-1816 (TJK)

# MEMORANDUM OPINION

Plaintiff Lester Hummer, proceeding pro se, sued the United States under the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.*, for injuries allegedly caused by thyroidectomy surgery he underwent at a Washington, D.C., Veterans Affairs medical center. Plaintiff claims that he was the victim of medical malpractice and that he was not adequately informed of the risks of his surgery. After granting summary judgment for the Government on the medical malpractice claims, the Court conducted a bench trial on the informed consent claim. For the reasons explained below, the Court finds that Plaintiff failed to prove his case by a preponderance of the evidence. Thus, it will enter final judgment for the Government.

**I.    Background**

Plaintiff was diagnosed with a relapse of Grave's disease, a type of hyperthyroidism, and after alternative treatment failed, he underwent thyroidectomy surgery at the Washington, D.C., Veterans Affairs Medical Center ("VAMC") in October 2016. ECF No. 1; ECF No. 33-5 at 3. After suffering injuries allegedly caused by that surgery, Plaintiff brought this suit pro se, alleging that he was not advised of the risks of surgery, in particular, the risk of damage to his laryngeal nerve, vocal cord, and parathyroid glands. ECF No. 1 at 4–7, 24–25. Plaintiff also alleged that

the operating doctor, Dr. Sonya Malekzadeh, as well as her team, committed medical malpractice in performing the surgery as well as in his post-operative care. *Id.* at 8–23, 25.

The parties cross-moved for summary judgment. The Court denied the cross-motions on Plaintiff's informed consent claim, concluding that a genuine dispute of material fact existed as to whether he was adequately informed of the risks of surgery. ECF No. 40 at 13–15. But the Court granted summary judgment as to the malpractice claims because Plaintiff could not prove his case without expert testimony, which he did not produce or even seek to develop before trial. *Id.* 40 at 11–12.

The Court conducted a bench trial on the remaining informed consent claim. Plaintiff called only himself as a witness.[1] *See* Trial Tr. 80:5–15. At the close of Plaintiff's case, the Government moved for judgment on partial findings under Federal Rule of Civil Procedure 52(c). Trial Tr. 66:20–69:25, 86:4–88:20. In its own case, the Government called Dr. Malekzadeh, Dr. David Yin, and Dr. Harika Nagavelli, each of whom had consulted with Plaintiff before his surgery at VAMC. The Government renewed its motion at the close of the evidence.[2] Trial Tr. 169:22–

---

[1] Given Plaintiff's difficulties speaking, he wrote down his responses to cross-examination questions as well as his own questions for the Government's witnesses, and these writings were relayed to the parties through the use of an overhead projector and then read into the record by the Court. *See* Trial Tr. 5:22-6:15, 27:10-18. Plaintiff also provided an opening statement and closing argument in writing—which, again, the Court read into the record—as well as his own affirmative trial testimony in writing. *See* Trial Tr. 12:6–9, 18:12–23:15; 172:19–173:11; ECF Nos. 61, 63. The Government agreed to a limited waiver of hearsay objections to allow that testimony in written form. *See* Trial Tr. 19:21–20:5. Plaintiff also responded to certain yes-or-no questions from the Court or on cross-examination by gesturing with a thumbs up or down, which was likewise memorialized in the record by the Court. *See* Trial Tr. 29:1–11.

[2] Federal Rule of Civil Procedure 52(c) provides, in relevant part, that "[i]f a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue."

170:1.  The Court reserved judgment on the motion.[3]  Trial Tr. 170:2–11.  After the trial, the Government filed its proposed findings of fact and conclusions of law.  ECF No. 65.  Plaintiff did not submit a counterproposal.[4]

## II.     Legal Standards

Generally, a plaintiff must prove his civil case by a preponderance of the evidence.  *See Addington v. Texas*, 441 U.S. 418, 424 (1979).  Under the Federal Tort Claims Act, as here, liability is governed by District of Columbia law, *i.e.*, the place where the complained-of conduct occurred.  *See* 28 U.S.C. §§ 2675, 1346(b).  And in the District of Columbia—just as in the federal system—plaintiffs bear the burden of proof by a preponderance of evidence.  *See Appleton v. United States*, 180 F. Supp. 2d 177, 182 (D.D.C. 2002) (collecting cases).

Under Federal Rule of Civil Procedure 52(a), in an action tried without a jury, the Court "must find the facts specifically and state its conclusions of law separately."  The Court's "findings and conclusions . . . may appear in an opinion or a memorandum of decision filed by the court."  Fed. R. Civ. P. 52(a)(1); *see also Defenders of Wildlife, Inc. v. Endangered Species Scientific Auth.*, 659 F.2d 168, 176 (D.C. Cir. 1981).  "In setting forth the findings of fact, the court need not address every factual contention and argumentative detail raised by the parties, [n]or discuss all evidence presented at trial.  Instead, the judge need only make brief, definite, pertinent findings and conclusions upon the contested matters in a manner that is sufficient to allow the appellate court to conduct a meaningful review."  *Yah Kai World Wide Enterprises, Inc. v. Napper*, 292 F.

---

[3] Because the evidence was closed at the trial's conclusion and the Court issues its findings under Rule 52(a) on all remaining claims, the Government's Rule 52(c) motion for partial judgment is denied as moot.  *See Belen Jesuit Preparatory School, Inc. v. Sportswear, Inc.*, No. 15-cv-22194 (UU), 2016 WL 4718165, at *1 (S.D. Fla. June 29, 2016) (collecting cases).

[4] The Court excused Plaintiff from any obligation to propose findings of fact and conclusions of law and does not penalize Plaintiff for not doing so.  *See* Trial Tr. 186:5–19; ECF No. 66.

Supp. 3d 337, 344 (D.D.C. 2018) (internal quotation marks and citations omitted).

## III. Findings of Fact

### A. Plaintiff's Medical History Leading to His Thyroidectomy

Plaintiff was treated for hyperthyroidism in approximately 2005 and sought treatment from VAMC in June 2015. Joint Stipulations of Fact, ECF No. 59 ("Jt. Stip."), ¶ 8. In June 2015, Plaintiff complained that he had lost 20 pounds and was suffering from diplopia (double vision), photophobia (light sensitivity), and swelling beneath the right eye. Plaintiff was diagnosed with Graves' disease by VAMC's staff. *Id.* ¶ 9. Graves' disease is the most common cause of hyperthyroidism and can cause eye problems such as bulging of the eyes, damage to the eye muscles resulting in double vision, swelling of the eyelids, and in severe cases, optic nerve damage and loss of vision. *Id.* ¶¶ 6–7. This is called thyroid eye disease ("TED") or Graves' orbitopathy. *Id.* Graves' disease can be treated with antithyroid drugs, radioactive iodine, or surgery. *Id.* ¶ 6. On August 11, 2015, Plaintiff complained of fatigue, double vision, abnormal intolerance to visual light, watery eyes, and eye swelling. *Id.* ¶ 10. On September 29, 2015, Plaintiff complained about his double vision to VAMC staff. *Id.* ¶ 11.

One of the alternative treatment procedures for Graves' disease—treatment through medication—was tried for months before Plaintiff's surgery, but more symptoms arose, including orbitopathy (a bulging of the eyes that caused double vision at times). Jt. Stip. ¶ 12. To try to treat his orbitopathy before the surgery, the prescription of Plaintiff's glasses was changed, but this effort was ineffective. *Id.* ¶ 13.

Before October 2016, Plaintiff had gone to VAMC clinic twice to meet with physicians who recommended he undergo a thyroidectomy, but Plaintiff did not make the decision to go through with the surgery until his appointment with Dr. Malekzadeh on October 4, 2016. Trial Tr. 104:4–13; Ex. D-12; Trial Tr. 53:24–55:15; Ex. D-39 (Pl. Dep. Tr. 69:20–70:7).

      **B.**     **Plaintiff's Appointment with Dr. Sonya Malekzadeh on October 4, 2016**

Plaintiff went to VAMC on October 4, 2016, to discuss with Dr. Malekzadeh thyroid surgery, also known as a thyroidectomy. Trial Tr. 91:20–92:1. Plaintiff's endocrinologist had referred him to Dr. Malekzadeh after non-surgical treatment of his Graves' disease were ineffective. Trial Tr. 92:5–14, 109:2–5; Ex. D-12; Jt. Stip. ¶¶ 12–13. Plaintiff *chose* to go to VAMC to meet with Dr. Malekzadeh that day to discuss undergoing a thyroidectomy, appearing at that appointment on his own volition. Trial Tr. 55:17–56:4. He was not forced to go to the October 4 appointment, nor were his VA benefits threatened if he were to not attend that appointment. Trial Tr. 55:22–56:2.

Dr. Malekzadeh is a doctor currently employed at the VAMC and MedStar Georgetown University Hospital. Trial Tr. 90:1–3. Dr. Malekzadeh specializes in otolaryngology, a surgical practice involving the medical and surgical disorders of the ear, nose, and throat. Trial Tr. 90:4–10. Dr. Malekzadeh has been a surgeon in her practice for nearly thirty years, and she has performed about six to seven hundred thyroidectomies over the course of her career. Trial Tr. 90:17–25. Before this case, Dr. Malekzadeh had never been involved in a lawsuit in which a patient alleged she committed malpractice. Trial Tr. 91:5–8.

Dr. Malekzadeh adheres to the following procedure when she meets with patients to discuss surgical procedures like a thyroidectomy: she reiterates the reason a thyroidectomy is the recommended treatment; states that she will be the surgeon performing the procedure; describes the surgical procedure from beginning to end (pre-operation, operation, and post-operation); details the risks and potential complications of the thyroidectomy; gives alternative options to the surgery; and answers any questions the patient may have. Trial Tr. 92:5–93:3.

Dr. Malekzadeh used plain language to describe to Plaintiff the reasons to undergo a thyroidectomy, the surgical process, the risks and potential complications of the surgery, and the

5

alternate options to surgery. Trial Tr. 103:25–106:15. To ensure Plaintiff understood each aspect of the procedure, Dr. Malekzadeh used limited medical jargon; she used layman's terms to provide Plaintiff with an easy-to-understand explanation of the thyroidectomy so that he could make an informed decision whether to proceed with the surgery. Trial Tr. 106:6–15, 107:4–7, 108:10–25. Having this conversation, as Dr. Malekzadeh did with Plaintiff, is part of the informed consent process. Trial Tr. 92:24–93:3.

The informed consent process is then memorialized through an electronic document maintained in the VA computer system. Using the iMed consent software connected to patients' medical records, Dr. Malekzadeh fills out the requisite portions confirming that she discussed the risks and benefits of the surgery with the patient before both she and the patient sign the form on an electronic pad. Trial Tr. 93:7–17; Ex. D-1.

Dr. Malekzadeh followed each of these steps when she met with Plaintiff—she informed Plaintiff of the details of the surgery, the risks and benefits, and the alternative options to proceeding with surgery. Trial Tr. 93:4–6; Ex. D-1. She then confirmed that Plaintiff intended to proceed with the thyroidectomy, selected a mutually agreeable date for the surgery, and accessed the informed consent form through his medical records. Trial Tr. 93:7–95:6.

Along with confirming the discussion of surgery risks and alternatives, the informed consent form also requires the signing doctor confirm that the patient has decision-making capacity. Trial Tr. 97:22–24; Ex. D-1. Decision-making capacity refers to the patient's ability to agree to a procedure or treatment fully knowing the risks, benefits, and alternatives of a procedure or therapy. Trial Tr. 98:1–5. Dr. Malekzadeh assesses a patient's decision-making capacity by evaluating the patient during the clinic examination as well as reviewing the patient's medical records for any indication that the patient would be unable to make an informed decision. Trial Tr. 98:6–17.

On October 4, 2016, Dr. Malekzadeh assessed that Plaintiff had decision-making capacity based on her discussion with Plaintiff and her review of his medical records. Trial Tr. 98:18–99:14; Ex. D-1; Ex. D-12.  Plaintiff's conversation with Dr. Malekzadeh did not suggest any mental or cognitive disorders that would impact his decision-making capacity, and his medical records did not reveal any issue that would affect Plaintiff's ability to make an informed decision about a thyroidectomy.  Plaintiff was lucid and understood the conversation.  Trial Tr. 99:17–22.  Dr. Malekzadeh does not recall and did not record any pain or suffering affecting Plaintiff's decision-making capacity during the appointment on October 4, 2016.  Trial Tr. 100:2–5.  Dr. Malekzadeh testified that she would not have proceeded with the informed consent form or discussion of the surgery had Plaintiff shown any indication that he lacked decision-making capacity.  Trial Tr. 99:22–100:1.

Finally, after choosing a date for the surgery, discussing the details of the thyroidectomy (process, risks, and alternatives), and assessing Plaintiff's decision-making capacity, Dr. Malekzadeh completed the informed consent form by signing the form herself and having Plaintiff sign the electronic pad.  Trial Tr. 96:9–97:3; Ex. D-1; Ex. D-12.  Dr. Malekzadeh had no doubt Plaintiff had decision-making capacity and consented to the thyroidectomy having been adequately informed of the potential risks and alternative treatments on October 4, 2016.  Trial Tr. 114:20–115:2, Ex. D-1; Ex. D-12.  After Plaintiff completed his appointment with Dr. Malekzadeh, Plaintiff was sent to meet with pre-operative nurses and an anesthesiologist.  Trial Tr. 120:3–17.  Dr. Malekzadeh did not see Plaintiff again until the day of the thyroidectomy, October 24, 2016.  Trial Tr. 121:11–16.

    **C.**    **Plaintiff's Appointment with Dr. David Yin on October 11, 2016**

On October 11, 2016, Plaintiff returned to VAMC for a pre-anesthesia evaluation with Dr. Yin before the thyroidectomy scheduled for October 24, 2016.  Trial Tr. 140:4–141:4; Ex. D-

7

14. Dr. Yin had been employed by VAMC as an anesthesiologist since February 3, 2010, until he retired in March 2021. Trial Tr. 134:21–135:17.

Dr. Yin had specialized in anesthesiology for thirty-five years, working in private practice for almost twenty-five years before his employment at VAMC. Trial Tr. 135:18–136:10. Dr. Yin was employed by VAMC in October 2016 as an anesthesiologist. Trial Tr. 135:18–22. During this appointment, Dr. Yin discussed Plaintiff's general anesthesia plan with Plaintiff. Trial Tr. 141:13–142:25, Ex. D-14. During the pre-anesthesia evaluation, Dr. Yin did not have any concerns about Plaintiff's ability to understand the conversation or communicate with Dr. Yin during the appointment. Trial Tr. 141:5–11. Dr. Yin described Plaintiff as "alert" and "responsive" during their conversation about the anesthesia plan for his thyroidectomy. Additionally, Dr. Yin noted that Plaintiff was a "good historian," meaning he could give an accurate assessment and recounting of his medical history. Trial Tr. 143:1–145:8; Ex. D-14. During Dr. Yin's time as an anesthesiologist, it was his practice to record any patient concerns during a pre-anesthesia evaluation. Trial Tr. 145:20–24. Dr. Yin testified that the absence of any record in Plaintiff's medical file that he was concerned about going forward with the thyroidectomy suggested to Dr. Yin that Plaintiff expressed no such concern. Trial Tr. 145:15–146:11; Ex. D-14.

### D. Plaintiff's Thyroidectomy Performed on October 24, 2016

After VAMC was not able to get ahold of Plaintiff by phone, the VAMC secure messaging system sent Plaintiff a reminder about his thyroidectomy on or around October 21, 2016, to provide Plaintiff with pre-operative instructions. Trial Tr. 120:19–121:9. Plaintiff willingly and voluntarily returned to VAMC on October 24, 2016, for his thyroidectomy surgery. Trial Tr. 59:8–9. Plaintiff admitted no one forced him to go to VAMC for his surgery; no one threatened him or threatened to take away his VA benefits if he did not show up, and he could have chosen not to show up to the thyroidectomy. Trial Tr. 59:10–19. Plaintiff went to VAMC on October

24, 2016, with the knowledge that he was going to have his thyroid removed. Trial Tr. 59:23–60:2. Plaintiff did not tell Dr. Malekzadeh or any other doctor that he did not wish to proceed with the thyroidectomy once he arrived at VAMC. Trial Tr. 60:3–7, 123:21–124:1.

The pre-operative area is where patients prepare for surgery, that is, where they change clothes, receive an IV, and meet Dr. Malekzadeh before surgery. Trial Tr. 121:17–22. When Dr. Malekzadeh meets with patients in the pre-operative area, her routine is to say hello, talk to the patients about the upcoming procedure, and offer them an opportunity to ask questions. Trial Tr. 121:22–24; Ex. D-15. This meeting occurs before the administration of any anesthesia. Trial Tr. 121:25–122:4.

As with her other patients, Dr. Malekzadeh met with Plaintiff in the pre-operative area along with the anesthesia provider and nurse circulator of the operating room. Trial Tr. 122:14–22. This team confirmed Plaintiff's identity by asking his name and birth date as well as asking Plaintiff to tell the team in his own words what procedure he was having. Trial Tr. 122:16–18. The team also asked about any allergies to medications Plaintiff might have, and whether Plaintiff wore contact lenses or dentures. Trial Tr. 122:18–21. The team also gave Plaintiff another opportunity to ask any questions before proceeding to the operating room. Trial Tr. 122:21–22.

Dr. Malekzadeh did not recall Plaintiff mentioning during that conversation in the pre-operative area that he was experiencing any pain and suffering that affected his decision-making capacity. Trial Tr. 123:5–9. Had Plaintiff made any comment suggesting that his pain and suffering was affecting his decision-making abilities, Dr. Malekzadeh testified that she would have asked Plaintiff further questions, exploring how his pain and suffering may have affected his decision-making ability, and ultimately would not have proceeded with the surgery if Plaintiff withdrew his consent or proved incapable of agreeing to proceed with the surgery. Trial Tr.

9

123:10–124:1.

During the pre-operative meeting, Dr. Malekzadeh reconfirmed that Plaintiff consented to the procedure. Trial Tr. 125:7–25. Based on Plaintiff's interactions with the surgical team in the pre-operative area, Dr. Malekzadeh noted that Plaintiff had "good" verbalized understanding, and she had no reason to doubt Plaintiff's decision-making capacity or whether Plaintiff wished to proceed with his thyroidectomy. Trial Tr. 130:7–132:1.

Dr. Nagavelli was the anesthesiologist for Plaintiff's thyroidectomy. Trial Tr. 153:9–16. Dr. Nagavelli is currently an anesthesiologist in Durham, Virginia, and was employed by VAMC in October 2016. Trial Tr. 152:9–15. Dr. Nagavelli's routine before bringing any patient into the operating room is to meet with the patient, discuss the plan of care, and give the patient time to ask any questions. Trial Tr. 153:17–22. Dr. Nagavelli also routinely assesses her patient's decision-making capacity by confirming the patient's identity, confirming the scheduled surgery, and discussing the patient's medical history before administering anesthesia. Trial Tr. 153:23–154:15, 155:8–156:5. Dr. Nagavelli does not recall the details of the day of Plaintiff's surgery. Trial Tr. 155:19–22. Because Plaintiff's thyroidectomy was a scheduled elective surgery, Dr. Nagavelli testified that she would have followed her routine of assessing Plaintiff's decision-making capacity before bringing him to the operating room. Trial Tr. 156:6–18. Dr. Nagavelli's assessment of Plaintiff's decision-making capacity was documented in an intraoperative record that reflected the discussion Dr. Nagavelli had with Plaintiff in the pre-operative room. Ex. D-19. This document was signed by Dr. Nagavelli, indicating she was responsible for its contents. Trial Tr. 157:2–12; Ex. D-19. This document reflects that Plaintiff agreed to and understood the anesthetic plan that had been discussed with Plaintiff before entering the operating room. Trial Tr. 159:7–160:5; Ex. D-19. Plaintiff would not have been brought into the operating room if he

had shown a lack of understanding or agreement with the planned surgery, and any such indication would have been documented in Plaintiff's medical records. Trial Tr. 160:6–22, 162:3–22. Dr. Nagavelli does not recall any conversation with Plaintiff in which he gave the impression he lacked decision-making capacity or expressed any trouble understanding the nature of the thyroidectomy because of any pain or suffering he was experiencing. Trial Tr. 161:15–162:22.

## IV. Conclusions of Law

Because Plaintiff sues the United States under the Federal Tort Claims Act's limited waiver of sovereign immunity, liability is governed by the law of the place where the complained-of act occurred—here, the District of Columbia. *See* 28 U.S.C. §§ 2675, 1346(b). Under the laws of the District, a plaintiff bringing an informed consent claim must prove that (1) "there was an undisclosed risk that was material," *i.e.*, "the physician should have known that knowledge of that risk might affect the patient's decision"; (2) "the risk materialized, injuring plaintiff"; and (3) "plaintiff would not have consented to the procedure if she had been informed of the risk." *Miller-McGee v. Washington Hosp. Ctr.*, 920 A.2d 430, 440 (D.C. 2007). As for the first element—that there was an undisclosed material risk—"the standard for measuring performance of the physician's duty to disclose is conduct which is reasonable under the circumstances." *Crain v. Allison*, 443 A.2d 558, 562 (D.C. 1982). But "at minimum, a physician must disclose the nature of the condition, the nature of the proposed treatment, any alternate treatment procedures, and the nature and degree of risks and benefits inherent in undergoing and in abstaining from the proposed treatment." *Id.*

Plaintiff's informed consent claim fails on the first prong: the evidence does not show, to a preponderance of the evidence, that VAMC doctors failed to disclose a material risk of performing the thyroidectomy. The VAMC medical team that met with Plaintiff and performed his surgery—Dr. Malekzadeh, Dr. Yin, and Dr. Nagavelli—all testified that, although they did not

11

recall all the specifics of their interactions with Plaintiff over four years later, their regular practice was to assess a patient's decision-making abilities and provide information on the nature of the proposed thyroidectomy and the risks and benefits of that surgery compared to alternative treatments.  *See, e.g.*, Trial Tr. 153:23–154:15, 155:8–156:18.  Dr. Malekzadeh, in particular, testified that she met with Plaintiff multiple times before surgery and disclosed the most serious potential complications, including pain in swallowing and difficulty speaking, and did not note any concerns about Plaintiff's decision-making ability.  *See* Trial Tr. 90:1–25, 92:2–95:6, 103:25–109:25.  The VAMC physicians also testified that if there had been any indication to the contrary—that Plaintiff could not make the decision to undergo surgery or otherwise did not want to pursue that course of treatment—they would have made a note in Plaintiff's medical records and would not have pressed on with surgery.  *See, e.g.*, Trial Tr. 145:15–146:11.  There is no such note in any record introduced at trial.  *See, e.g.*, Exs. D-12, D-14, D-19.  To the contrary, the Government submitted a consent form bearing Plaintiff's signature, Ex. D-1, which is "strong evidence the [Plaintiff] rendered his informed consent," *see Hill v. Medlantic Health Care Grp.*, 933 A.2d 314, 331 (D.C. 2007); *see also Graff v. Malawer*, 592 A.2d 1038, 1041 (D.C. 1991).  Among other things, the form includes "[k]nown risks and side effects," including "[d]ifficulty or pain in swallowing," "[p]otential need for further treatment," and "[p]ossible damage to nerves to voice box creating permanent hoarseness or change in voice," and also notes Dr. Malekzadeh's assessment that "[t]he patient HAS decision-making capacity." Ex. D-1 at 1–2.  The form states that the patient attests that someone has "explained how this treatment/procedure could help me, and things that could go wrong," and "told me about other treatments or procedures that might be done instead, and what would happen if I have no treatment/procedure." *Id*. at 4.  Still, the patient attests by signing the form, "I choose to have this procedure." *Id*.

12

Plaintiff, for his part, testified that the VAMC physicians did not discuss the known risks and side effects of the surgery with him, and suggested at times that he lacked decision-making capacity and that the physicians should have known that he lacked such capacity because of his weak voice, hearing loss, or other medical issues. *See, e.g.*, Trial Tr. 34:20–36:2, 40:20–23, 56:3–14; 79:2–8; *see generally* ECF No. 61 (Plaintiff's Sworn Trial Position). But Plaintiff relied on only these (mostly conclusory) assertions and offered no other evidence to explain or support them. In the face of the overwhelming contrary evidence produced by the Government in the form of both testimony and medical records, including the informed consent form, the Court does not find Plaintiff's testimony on these points credible.[5] Thus, Plaintiff has not shown by a preponderance of the evidence that there was an undisclosed material risk of surgery, or that Plaintiff was incapable of providing informed consent. *See Graff*, 592 A.2d at 1041 ("testimonial and documentary evidence in the record, particularly [a] consent form that bore what [the patient] admitted was his signature, [was] so overwhelmingly contrary to [the patient's] position" that he lacked informed consent, that no reasonable jury could have found for the patient).

## V.   Conclusion

For all the above reasons, the Court finds that Plaintiff has failed to establish by a preponderance of the evidence that he lacked informed consent to undergo the thyroidectomy at VAMC.

---

[5] Plaintiff also testified that he did not even see the informed consent form until long after the surgery, Trial Tr. 41:20–22, despite his acknowledgement that he signed the electronic pad connected to Dr. Malekzadeh's computer as part of the informed consent process, Trial Tr. 57:9–14. But even assuming Plaintiff never read the entire form on Dr. Malekzadeh's computer at the time he signed it, that would not get him far. Dr. Malekzadeh testified credibly that, *before* she filled out the form with Plaintiff, she discussed with him the relevant risks and benefits of the procedure that are reflected on the form, as well as alternative treatments. Trial Tr. 107:12–109:14. Moreover, the form itself contemplates such a process, requiring only an attestation by the patient that he was "offered the opportunity to read the consent form," not that the patient actually did so. Ex. D-1 at 4.

Thus, the Court will enter judgment for the Government. A separate order will issue.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: October 26, 2023